STEWART TRUCKING, INC., A NEBRASKA CORPORATION, APPELLANT, V. PBX, INC., A NEBRASKA AND DELAWARE CORPORATION, APPELLEE. EUGENE WENZEL, DOING BUSINESS AS WENZEL TRUCKING, AN INDIVIDUAL, APPELLANT, V. PBX, INC., A NEBRASKA AND DELAWARE CORPORATION, APPELLEE.
473 N.W.2d 123

Filed August 23, 1991.    Nos. 89-427, 89-428.

Tim Engler and Gregory D. Barton, of Heron, Burchette, Ruckert & Rothwell, and Stewart B. Mills for appellants.

John M. Guthery, of Perry, Guthery, Haase & Gessford, P.C., and, on brief, Michael O. Johanns and Richard A. Peterson, of Peterson Nelson Johanns Morris & Holdeman, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

SHANAHAN, J.

Stewart Trucking, Inc., and Eugene Wenzel, doing business as Wenzel Trucking, each brought a breach of contract action against PBX, Inc., for payment of additional "revenues generated by trip leasing" of equipment which PBX had leased from Stewart and Wenzel.

All parties stipulated that after negotiations preliminary to signing the equipment leases, Stewart and Wenzel agreed to a "compensation" rate at 90 percent of the gross revenues generated under the leases with PBX, but that the drafted leases, in their compensation provisions, unnoticed by the parties, stated that the compensation rate was 100 percent of all revenue from the leases. The parties mutually and mistakenly believed that the drafted leases, which they signed, correctly reflected their agreements. None of the parties discovered the mistake before concluding the use of equipment under the leases. A dispute arose concerning the amounts due as compensation prescribed by the leases. When the parties were unable to agree on the amounts, Stewart and Wenzel each filed a breach of contract action in the district court for Dakota County, where PBX, alleging the mutually mistaken compensation rate, namely, 90 percent vis-a-vis 100 percent, counterclaimed and requested reformation of the leases to reflect the agreed rate of compensation, that is, 90 percent.

Title 49 U.S.C. § 11107(a)(1) (1988) provides that the Interstate Commerce Commission may require that a motor carrier, when leasing motor vehicles for transportation of property, "make the arrangement in writing signed by the parties specifying its duration and the compensation to be paid by the motor carrier."

Regulations of the Interstate Commerce Commission apply to the leases in question, especially 49 C.F.R. §§ 1057.11 and 1057.12 (1990).

Section 1057.11 of the Interstate Commerce Commission regulations provides:

> [T]he authorized carrier may perform authorized transportation in equipment it does not own only under the following conditions:
>
> (a) *Lease*—There shall be a written lease granting the use of the equipment and meeting the requirements contained in § 1057.12.

Section 1057.12 of the Interstate Commerce Commission regulations states:

> [T]he written lease required under § 1057.11(a) shall contain the following provisions. The required lease provisions shall be adhered to and performed by the authorized carrier.
>
> . . . .
>
> (d) *Compensation to be specified*—The amount to be paid by the authorized carrier for equipment and driver's services shall be clearly stated on the face of the lease or in an addendum which is attached to the lease.

In addition to the factual background regarding the leases, the parties stipulated that if 90 percent were determined to be the correct compensation rate for the leases, PBX had fully paid Stewart and Wenzel on the basis of the 90-percent rate; hence, PBX would not be required to make additional payments to Stewart and Wenzel concerning the leases.

The district court concluded that as a result of the mutual mistake in the compensation rate expressed in the leases in contrast with the actually agreed rate, PBX was entitled to reformation of the leases, relief which the court ordered. Consequently, the court dismissed the breach of contract

actions inasmuch as both Stewart and Wenzel had been fully paid under their court-reformed leases with PBX.

## ASSIGNMENT OF ERROR

Stewart and Wenzel contend:

The District Court erred in reforming the motor carrier leases on the basis of mutual mistake. The District Court erroneously elevated conflicting state law over the ICC motor carrier leasing regulations which pre-empt the field. These regulations require the interstate leases to be in writing, require the leases to contain a written compensation term, and require specific performance of all required terms in the written lease.

Brief for appellants at 4.

## STANDARD OF REVIEW

"Regarding a question of law, an appellate court has an obligation to reach a conclusion independent from a trial court's conclusion in a judgment under review." *Huffman v. Huffman*, 232 Neb. 742, 748, 441 N.W.2d 899, 904 (1989). Accord, *State ex rel. Gaddis v. Gaddis*, 237 Neb. 264, 465 N.W.2d 773 (1991); *State ex rel. Spire v. Northwestern Bell Tel. Co.*, 233 Neb. 262, 445 N.W.2d 284 (1989); *Lutheran Medical Center v. City of Omaha*, 229 Neb. 802, 429 N.W.2d 347 (1988); *In re Estate of Walker*, 224 Neb. 812, 402 N.W.2d 251 (1987).

## ICC MOTOR CARRIER LEASING REGULATIONS

The Interstate Commerce Act was enacted pursuant to the power granted to Congress for regulation of interstate commerce under the commerce clause of U.S. Const. art. I, § 8. See *Interstate Com. Commiss. v. B. & O. Railroad*, 145 U.S. 263, 12 S. Ct. 844, 36 L. Ed. 699 (1892).

A legislative act or statute of the United States enacted pursuant to the U.S. Constitution is a part of "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. The supremacy clause of the U.S. Constitution binds the several states, subordinates state law, including legislation, to a congressional enactment, and constitutionally provides that federal law supersedes conflicting state law. See, *Chapman v. Union Pacific Railroad*, 237 Neb. 617, 467 N.W.2d 388 (1991) (Federal Employers'

Liability Act); *State ex rel. Douglas v. Karnes*, 216 Neb. 750, 346 N.W.2d 231 (1984) (federal tax reform act).

> The principal objects of the Interstate Commerce Act were to secure just and reasonable charges for transportation; to prohibit unjust discriminations in the rendition of like services under similar circumstances and conditions; to prevent undue or unreasonable preferences to persons, corporations or localities; to inhibit greater compensation for a shorter than for a longer distance over the same line; and to abolish combinations for the pooling of freights.

*Interstate Com. Commiss. v. B. & O. Railroad, supra* at 145 U.S. at 276.

As a result of the general rulemaking authority contained in the Interstate Commerce Act, the Interstate Commerce Commission promulgates regulations which govern leasing by interstate motor carriers. See *American Trucking Assns. v. U. S.*, 344 U.S. 298, 73 S. Ct. 307, 97 L. Ed. 337 (1953). Regulations of the Interstate Commerce Commission governing leases of interstate motor carriers have the same effect as statutory federal law and, therefore, preempt conflicting state law. See *Simmons v. King*, 478 F.2d 857 (5th Cir. 1973) (regulations of the Interstate Commerce Commission preempt conflicting state law regarding vicarious liability). Cf. *A., T. & S. F. Ry. v. Scarlett*, 300 U.S. 471, 57 S. Ct. 541, 81 L. Ed. 748 (1937) (regulations of the Interstate Commerce Commission promulgated pursuant to the Federal Safety Appliance Act have the same force as federal statutes). Cf., also, *Free v. Bland*, 369 U.S. 663, 82 S. Ct. 1089, 8 L. Ed. 2d 180 (1962) (U.S. Treasury regulations specifying ownership of a savings bond are federal law which prevails over conflicting state law on ownership).

Generally, regulations of the Interstate Commerce Commission require that interstate motor carrier leases be in writing, receipts be issued and identify leased equipment, records be maintained pertaining to use of leased equipment, terms for compensation be clearly specified, and public liability insurance coverage be obtained. See 49 C.F.R. part 1057 (1990). The Interstate Commerce Commission has declared that an

objective of leasing regulations is truth-in-leasing through disclosure. See *Lease and Interchange of Vehicles*, 129 M.C.C. 700 (1978).

Wenzel and Stewart argue that since § 1057.12(d) requires that compensation be "clearly stated on the face of the lease" and since § 1057.12 requires that the lease "shall be adhered to and performed by the authorized carrier," PBX must perform the lease as written irrespective of the undisputed mutual mistake in the compensation rate. Furthermore, Stewart and Wenzel argue that since federal law mandates "specific performance" of an interstate motor carrier lease, PBX cannot modify its obligation under the lease because federal law, pursuant to the supremacy clause, subordinates conflicting state law on questions concerning the leases.

"Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S. Ct. 2114, 68 L. Ed. 2d 576 (1981). See, also, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947) (historic police powers of the states are not superseded by a federal act unless Congress clearly intends that the federal law preempt state law).

In *Louisiana Public Service Comm'n v. FCC*, 476 U.S. 355, 368-69, 106 S. Ct. 1890, 90 L. Ed. 2d 369 (1986), the Supreme Court stated:

> Pre-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, *Jones v. Rath Packing Co.*, 430 U. S. 519 [97 S. Ct. 1305, 51 L. Ed. 2d 604] (1977), when there is outright or actual conflict between federal and state law, *e.g.*, *Free v. Bland*, 369 U. S. 663 [82 S. Ct. 1089, 8 L. Ed. 2d 180] (1962), where compliance with both federal and state law is in effect physically impossible, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U. S. 132 [83 S. Ct. 1210, 10 L. Ed. 2d 248] (1963), where there is implicit in federal law a barrier to state regulation, *Shaw v. Delta Air Lines, Inc.*, 463 U. S. 85 [103 S. Ct. 2890, 77 L. Ed. 2d 490] (1983), where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no

room for the States to supplement federal law, *Rice v. Santa Fe Elevator Corp.*, 331 U. S. 218 [67 S. Ct. 1146, 91 L. Ed. 1447] (1947), or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. *Hines v. Davidowitz*, 312 U. S. 52 [61 S. Ct. 399, 85 L. Ed. 581] (1941). Pre-emption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation. *Fidelity Federal Savings & Loan Assn. v. De la Cuesta*, 458 U. S. 141 [102 S. Ct. 3014, 73 L. Ed. 2d 664] (1982); *Capital Cities Cable, Inc. v. Crisp*, 467 U. S. 691 [104 S. Ct. 2694, 81 L. Ed. 2d 580] (1984).

"Although Congress has heavily regulated the field of interstate motor carriers, it has not excluded all state regulation." *Parten v. Consolidated Freightways Corp.*, 923 F.2d 580, 583 (8th Cir. 1991). For that reason, state law has been held applicable to determine an agent's authority to bind a principal to a contract. See *Laux v. Juillerat*, 680 F. Supp. 1131 (S.D. Ohio 1987), *aff'd* 860 F.2d 1079 (6th Cir. 1988).

In our review of the Interstate Commerce Act and the regulations of the Interstate Commerce Commission regarding leases involving interstate motor carriers, we have found no federal requirements or standards for a determination whether a lease exists. While the interstate commerce regulations controlling interstate motor carrier leases refer to a carrier's adherence to and performance of a lease, federal law supplies no requisite principles of contract law to determine whether a lease, as a contract, has come into existence and subsists for enforcement through judicial action. Thus, Congress has not comprehensively and exclusively legislated on the subject of interstate motor carrier leases and thereby occupied the entire field of law for leases involving interstate motor carriers, nor has Congress expressed a clear intent that states are excluded from controlling remedies in causes of action arising out of interstate motor carrier leases. In the absence of exclusive federal law, there is no conflict between Nebraska law and federal law on the subject of interstate motor carrier leases. Hence, we find nothing in federal law which precludes

application of Nebraska law to causes of action and remedies regarding a lease of equipment involved in interstate commerce. Moreover, enforcement of the real agreement between lessor and lessee will tend toward truth-in-leasing, an expressed objective of the federal law. Accordingly, we hold that federal law governing interstate motor carrier leases does not preempt Nebraska law in determining whether a lease, as a contract, has come into existence and subsists for enforcement in a Nebraska court.

Although not directly related to the question presented in this appeal, 49 U.S.C. § 10761(a) (1988) and its interpretative federal decisions provide an analog. Section 10761(a), which has come to be known as the "filed rate" doctrine, in part states that an

> [interstate motor] carrier may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff whether by returning a part of that rate to a person, giving a person a privilege, allowing the use of a facility that affects the value of that transportation or service, or another device.

However, the Interstate Commerce Commission has already recognized equitable defenses to eliminate unfair application of the filed rate doctrine, for example, a contract formed by mutual mistake. See *Buckeye Cellulose Corp. v. L&N R.R. Co.*, 1 I.C.C.2d 767 (1985), *aff'd sub nom., Seaboard System R.R., Inc. v. United States*, 794 F.2d 635 (11th Cir. 1986). See, also, *Maislin Industries v. Primary Steel, Inc.*, 879 F.2d 400 (8th Cir. 1989) (application of the equitable defense may be proper when the published rate in a filed tariff is greater than the rate agreed upon by the parties); *ACF Industries, Inc.—Petition for Exemption*, No. 40194 at 4 (I.C.C. May 1, 1989) (WESTLAW No. 238488) ("[r]igid insistance [sic] upon payment of the applicable tariff rate has given way where evidence showed a mutual misunderstanding or that both shipper and carrier intended a different rate to apply").

## MUTUAL MISTAKE

Under the circumstances, federal law does not prohibit application of Nebraska law, which includes reformation of a

contract containing a mutual mistake by parties to the contract. As we expressed in *Newton v. Brown*, 222 Neb. 605, 613, 386 N.W.2d 424, 430 (1986): "If incorrect language or wording is inserted by mistake, including a scrivener's mistake, into an instrument intended to reflect the agreement of the parties, such mistake is mutual and contrary to the real intention and agreement of the parties." The stipulated and, therefore, undisputed facts establish that all parties to the leases in question intended that the rate of compensation be 90 percent of revenue derived from each lease. However, through a mistake in drafting, the compensation rate was designated at 100 percent notwithstanding the 90 percent compensation rate agreed by the parties. For that reason, the mistake was mutual and contrary to the intention and real agreement of the parties. Under Nebraska law, PBX was entitled to reformation of the leases, the relief ordered by the district court. From our independent examination of the record and application of appropriate law, we reach the same conclusion as that reached by the district court and, consequently, affirm the judgment of the district court.

AFFIRMED.